## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL CASE NO. 3:19-cv-00193-MR

| | |
|---|---|
| KEITH MCCARTHY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **MEMORANDUM OF** |
| vs. | ) **DECISION AND ORDER** |
| | ) |
| APRIL CARDELLA, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**THIS MATTER** is before the Court on the *pro se* Plaintiff's Motions for Summary Judgment [Docs. 36, 37] and Defendants' Motion for Summary Judgment [Doc. 38].

## I.    BACKGROUND

The incarcerated Plaintiff Keith McCarthy, proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 addressing incidents that allegedly occurred at the Union County Jail ("Jail") while he was a pretrial detainee.[1] He names as Defendants: April Cardella and Christian Green, Union County

_____

[1] The Plaintiff was charged with first degree murder, robbery with a dangerous weapon, and concealing/failing to report death.  [See Doc. 1: Complaint Ex at 15].  The Plaintiff is currently incarcerated at the Avery-Mitchell Correctional Institution for second-degree murder.

Sheriff's Office ("UCSO") detention officers;[2] and Eddie Cathey, the Union County Sheriff. The Complaint passed initial review on claims that Defendants Cardella and Green used excessive force and that Defendant Cathey was deliberately indifferent to the Plaintiff's serious medical needs and retaliated against him.[3] [Doc. 9: Order on Initial Review].

Now the parties have filed Motions for Summary Judgment.[4] The Court notified the Plaintiff of the opportunity to respond to Defendants' Motion and to present evidence in opposition pursuant to Fed. R. Civ. P. 56. [Doc. 43: Roseboro[5] Order]. The Plaintiff filed a Response to the summary judgment motion.[6] [Doc. 51: Plaintiff's MSJ Response]. The parties did not file replies

---

[2] Defendants Green and Cardella are no longer employed by UCSO.

[3] This case was assigned to Judge Frank D. Whitney at that time.

[4] The Plaintiff's Motion for Summary Judgment against Defendants Cardella and Green [Doc. 36] will be referred to as "Plaintiff's MSJ 1" and the Plaintiffs Motion for Summary Judgment against Defendant Cathey [Doc. 37] will be referred to as "Plaintiff's MSJ 2." The Court will seal, *sua sponte*, those summary judgment Exhibits filed by the *pro se* Plaintiff containing confidential information pursuant to the Protective Order that was entered in this case. [See Doc. 28: Protective Order].

[5] Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975).

[6] It appears that the Plaintiff attempts to raise a new due process claim in his summary Judgment Response. [Doc. 51: Plaintiff's MSJ Response at 11]. However, this claim was not included in the Complaint and thus was not subjected to initial review. See generally Fed. R. Civ. P. 15 (addressing amendment); 28 U.S.C. § 1915A (requiring initial review in prisoner civil cases). Therefore, this claim is not properly before the Court and it will not be discussed further in this Order.

2

and the time to do so has expired.  Having been fully briefed, this matter is ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Id. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat

3

a motion for summary judgment.  Id. at 324.  Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials" in the record.  See id.; Fed. R. Civ. P. 56(c)(1)(a).  Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."  Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 175, 180 (4th Cir. 2000).  The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. FACTUAL BACKGROUND

The parties' forecasts of evidence show the following, which is undisputed except as otherwise noted.

### A. Use of Force Incidents

On the morning of April 20, 2016, Cardella entered the E Block of the Jail where the Plaintiff was housed in order to escort the inmates outside for exercise. [Doc. 39-1: Cardella Aff. at ¶ 6]. Cardella stood in the restroom doorway to prevent the inmates from going into the restroom and flushing any contraband they may have hidden in the cell block. [Id. at ¶ 8]. The Plaintiff began walking toward Cardella, and Cardella told him that he would not be able to use the restroom before he went outside. [Id. at ¶ 10]. The Plaintiff continued stepping toward Cardella and said, "I am going to use the damn restroom."[7] [Id. at ¶ 11]. When the Plaintiff continued to advance on Cardella, she "stuck [her] left hand out in front of [her], palm out, in a 'stopping' motion. At the same time, [she] used [her] right hand to pull [her] OC (Chemical) Spray container out of its holster." [Id. at ¶ 12]. The Plaintiff is larger than Cardella. [Id. at ¶ 13]. Cardella was afraid of the Plaintiff because he stepped towards her in defiance of her instructions and because

---

[7] In his Verified Complaint, the Plaintiff states that he told Cardella that he really needed to use the restroom and that he was not disrespectful. [Doc. 1: Complaint at 7].

5

she knew he was being held on a charge of homicide. [Id.]. The Plaintiff approached so close to Cardella that, with her left hand extended, Cardella could nearly touch Plaintiff's shoulder. [Id. at ¶ 14]. Cardella instructed Plaintiff to "take a step back or I am going to spray you" with OC spray. [Id. at ¶ 15; Doc. 1: Complaint at 7]. The Plaintiff stopped and took one step backwards. [Doc. 39-1: Cardella Aff. at ¶ 16; Doc. 1: Complaint at 7]. Cardella re-holstered her OC spray and instructed the Plaintiff to go out to the recreation yard. [Doc. 39-1: Cardella Affid. at ¶ 17]. The Plaintiff "defied [her] orders stating 'I am not going to the yard. I'm not going.'"[8] [Id. at ¶ 18].

Cardella instructed the Plaintiff to turn around and place his hands behind his back. [Id. at ¶ 19]. The Plaintiff complied and Cardella approached to handcuff him. [Id. at ¶ 20]. When Cardella took hold of the Plaintiff's right arm to apply the cuffs, "he attempted to pull away."[9] [Id. at ¶21]. Cardella immediately grabbed the Plaintiff's right wrist and cuffed it.[10] [Id. at ¶ 22]. She then completed securing the handcuffs on the Plaintiff. [Id. at ¶ 23]. The Plaintiff asked Cardella to loosen the cuffs because they were

---

[8] The Plaintiff states that the inmates were previously told that they could sit in a holding cell if they did not want to go outside. [Doc. 1: Complaint at 7].

[9] The Plaintiff asserts that he complied with Cardella with regards to handcuffing. [Doc. 1: Complaint at 8].

[10] The Plaintiff asserts that Cardella cuffed him "forcefully." [Doc. 1: Complaint at 8].

"pinching [his] skin." [Doc. 1: Complaint at 8]. Cardella agreed to loosen the cuffs but failed to do so. [Id.]. The Plaintiff then asked to see a sergeant. [Id.].

The Plaintiff was placed in Holding Cell 1. [Doc. 39-1: Cardella Aff. at ¶¶ 24-25]. Escorting an inmate from the blocks to a holding cell is standard procedure when an inmate has disobeyed commands and acted in open defiance in any way. [Id. at ¶ 26]. This provides the inmate a place to "cool down" and allows a supervisor to speak to the inmate. [Id.]. The Plaintiff again asked to see a sergeant. [Doc. 1: Complaint at 8]. Cardella told the Plaintiff he would see a sergeant as soon as she closed the cell door. [Id.]. Cardella and Green placed Plaintiff in the holding cell in handcuffs and secured the door. [Doc. 39-1: Cardella Aff. at ¶ 27].

Cardella and Green returned to the holding cell about 10 minutes later. [Doc. 1: Complaint at 8]. Cardella attempted to remove the Plaintiff's cuffs through the cell's trap but was unsuccessful. [Doc. 39-1: Cardella Aff. at ¶ 30; Doc. 1: Complaint at 8]. Green and Cardella entered the holding cell to uncuff the Plaintiff. [Doc. 39-1: Cardella Aff. at ¶ 31]. The Plaintiff was directed to get down on one knee and he complied. [Id. at ¶ 32]. The Plaintiff was then directed to lie down on his stomach. [Id. at ¶ 33; Doc. 1: Complaint at 8]. Rather than complying, the Plaintiff "began twisting toward Officer

Green and [Cardella]" who were standing behind him.[11] [Doc. 39-1: Cardella Aff. at ¶ 35]. Cardella placed the Plaintiff on his stomach from his kneeling position.[12] [Id. at ¶ 36]. Cardella removed the cuff from the Plaintiff's left hand, then she directed the Plaintiff to place his hand on his head for officer safety.[13] [Id. at ¶¶ 39-40]. Instead of placing the uncuffed left hand on his head, the Plaintiff attempted to place his right hand, which was still cuffed, on his head. [Id. at ¶ 41]. Cardella perceived the Plaintiff's attempt to pull his right hand away from Cardella after she uncuffed his left hand as "as an attempt to gain control of a weapon (the open left handcuff)." [Id. at ¶ 44]. Cardella held on tightly to the Plaintiff and did not release her hold on the open handcuff. [Id. at ¶¶ 42-43, 45]. Cardella then finished uncuffing the Plaintiff and secured the cell. [Id. at ¶ 46]. Cardella walked out of the cell,

---

[11] The Plaintiff had two back surgeries before he was incarcerated and had a 12% disability rating for his back on the date he was taken into custody. [Doc. 1: Complaint at 3, 12]. The Plaintiff states that he was unable to lie down as instructed because it caused his back too much pain, and that he told Cardella that he is 25 to 30% disabled. [Id. at 9]. He asserts in his verified summary judgment response that, while he was on his knees, he was "no threat to the officers or [himself]." [Doc. 36: Plaintiff's MSJ 1 at ¶ 16].

[12] The Plaintiff states that Cardella "grabbed [his] wrist and shoulder and started forcing [him] down" and that this was "extremely painful and [Plaintiff] cried out." [Doc. 1: Complaint at 9]. The Plaintiff alleges that he was then "slammed to the floor and both Officer Cardell and Green had [their] knees in [Plaintiff's] back." [Doc. 1: Complaint at 9].

[13] The Plaintiff asserts that he was told to put one hand on his head and one hand behind his back while kneeling and that he was unable to lie down from that position. [Doc. 1: Complaint at 8-9].

8

"smirking like the situation was funny." [Doc. 1: Complaint at 9]. The Plaintiff again asked for a sergeant and Cardella said he would see one. [Id.].

The Defendants have submitted a video file containing the footage from E Block at the time of the encounter between the Plaintiff and Cardella at the bathroom entrance.[14] It shows the following events:

| | |
|---|---|
| 00:16 | Cardella enters E Block. |
| 00:31 | Cardella positions herself in the bathroom entrance. |
| 01:20 | An inmate approaches Cardella and speaks to her. |
| 01:23 | Plaintiff approaches, quickly steps in front of the inmate speaking to Cardella, and keeps approaching as Cardella steps away from him. |
| 01:40 | Plaintiff steps back from Cardella. |
| 01:44 | Plaintiff turns away from Cardella. |
| 01:48 | Plaintiff places his hands behind his back. |
| 01:52 | Cardella begins handcuffing the Plaintiff. |
| 01:59 | Plaintiff looks over his shoulder at Cardella. |
| 02:06 | Plaintiff steps back towards Cardella and dips slightly. |
| 02:10 | Plaintiff kneels. |

---

[14] Holding Cell 1 did not have a video camera inside of it on April 20, 2016. [Doc. 39-5: Medlin Aff. at ¶ 19].

9

02:38    Cardella helps Plaintiff stand and escorts him away.

[Doc. 42: Cell Block E Video].

## B. Medical Care

Sergeant Christopher Medlin[15] went to Holding Cell 1 to speak with the Plaintiff at approximately 8:45 a.m. on April 20, 2016. [Doc. 39-5: Medlin Aff. at ¶ 4]. Medlin took pictures of the Plaintiff's wrists at that time to document any injuries he may have sustained.[16] [Id. at ¶ 6]. Medlin observed no cuts or other injuries on the Plaintiff aside from a "minor abrasion on his right wrist." [Id. at ¶ 8]. Medlin offered the Plaintiff the opportunity to be seen by medical for the injuries on his wrist pursuant to Jail policy, but the Plaintiff refused medical care. [Id. at ¶ 11; Doc. 39-1: Cardella Aff. Ex at 13, 15; Doc. 51: Plaintiff's MSJ Response at 4].

The Plaintiff submitted a medical inquiry the next day, April 21, 2016, stating he "was injured by an officer yesterday and [is] having a lot of pain with [his] back." [Doc. 50: Inmate Medical Files at 28]. Sergeant Medlin took the Plaintiff to medical sick call that same day. [Doc. 39-5: Medlin Affid. at ¶ 20]. At the sick call appointment that day the Plaintiff "point[ed] to the flank

---

[15] Sergeant Medlin is not a Defendant in this case.

[16] The Plaintiff asserts that several photographs were also taken of his back on April 20, 2016 [Doc. 51: Plaintiff's MSJ Response at 9], but that only one of those photographs was produced in discovery. [See Doc. 51-1: Plaintiff's MSJ Response Ex at 24].

10

area bilaterally," but the provider noted no bruising, edema, or redness to the back.[17] [Id. at 108]. The Plaintiff received a seven-day course of ibuprofen for his reported pain. [Id. at 28, 101, 108].

The Plaintiff submitted a medical inquiry on April 23, 2016, stating that the medicine was not helping his back. [Doc. 50: Inmate Medical Files at 27]. He was instructed to keep taking the ibuprofen "to get it in [his] system on a consistent basis," then submit a sick call request if needed. [Id. at 27].

The Plaintiff submitted another medical inquiry on April 28, 2016, after completing the course of ibuprofen. [Doc. 50: Inmate Medical Files at 26]. He was seen on sick call that same day and was given a 14-day course of naproxen. [Id. at 101]. The Plaintiff submitted a medical inquiry on May 2, 2016 for continued pain. [Id. at 25]. The Plaintiff was told to continue taking the naproxen until he could be seen by a provider on May 5, 2016. [Id. at 108]. At his May 5 appointment, the Plaintiff reported that pain radiated to his right side; the provider observed mild tenderness. [Id.].

The Plaintiff filed a medical grievance for back pain on May 19, complaining that his back still hurt and that his pain medication would end

_____

[17] The Plaintiff asserts that the April 20, 2016 photograph of his back shows redness and "the start of bruising" from the officers' knees. [Doc. 51: Plaintiff's MSJ Response at 9; Doc. 51-1: Plaintiff's MSJ Response Ex at 24]. The Plaintiff further asserts that additional pictures were taken at medical on April 21, 2016 which were not produced in discovery. [Doc. 36: Plaintiff's MSJ 1 at ¶ 23; Doc. 36-1: Plaintiff's MSJ 1 Ex at 27].

the next day. [Doc. 50: Inmate Medical Files at 22]. That same day, doctor renewed the naproxen and ordered x-rays of the Plaintiff's spine. [Id. at 101]. On that day, medical personnel asked the Plaintiff about his back pain, but he refused to answer and said "just give me my meds"; later, he was observed running up and down the stairs with a normal gait. [Id. at 107]. The next day, an x-ray technician attempted to x-ray the Plaintiff's back, but the Plaintiff became irritated with the x-ray technician, got off the table, and left. [Doc. 37-1: Plaintiff's MSJ 2 Ex at 12; Doc. 50: Inmate Medical Files at 107].

On June 5, 2016, a nurse observed the Plaintiff "running up steps to visitation," bending over without difficulty, and walking without limping. [Doc. 50: Inmate Medical Files at 106]. The Plaintiff filed a medical inquiry that day requesting a follow-up appointment for his back and he was seen on sick call that same day. [Id.]. The Plaintiff was told that he needed to cooperate with the x-ray technician so that x-rays could be taken and the Plaintiff agreed. [Id.]. The Plaintiff was brought to medical for x-rays the next day, June 6, 2016. [Id.]. The Plaintiff jumped up onto the exam table without difficulty and without using the step, lay flat on the x-ray board, sat up without difficulty after the x-ray, jumped off the exam table after the x-rays were taken, and showed no signs of distress. [Id.].

On June 8, 2016, the Plaintiff was informed that the x-rays showed "no acute changes to his x-ray;" that the hardware that was placed in a prior surgery was in place; and that "[degenerative disc disease] is present as seen in 2009 x-ray." [Doc. 50: Inmate Medical Files at 100]. The Plaintiff was given a copy of back exercises and was offered instructions if needed. [Id. at 106]. On June 12, 2016, the Plaintiff was asked whether the exercises were helping but he did not respond. [Id.].

The Plaintiff filed a medical inquiry about back pain on June 27, and he was seen on sick call the same day to discuss and renew his medication. [Doc. 50: Inmate Medical Files at 19, 105]. The medication was renewed again on July 2, 2016. [Id. at 100].

## C. Safekeeping Transfers

North Carolina law recognizes medical safekeeping orders. [Doc. 44-1: Dennis Aff. at ¶ 8]. Under medical safekeeping, when the Inmate Health staff decides that local facilities are inadequate to meet an inmate's medical needs, Jail staff contact the Department of Adult Correction (DAC) to ensure a bed is available, present the information to the Court, obtain a safekeeping order, and transport the inmate to DAC. [Id. at ¶ 10]. When another party obtains a safekeeping order, Jail staff attempt to carry it out as quickly as possible but, because the advance work such as ensuring the availability of

13

a bed has not been worked out ahead of time, safekeeping orders not obtained by Jail staff may result in a delay. [Id. at ¶ 11].

On July 25, 2016, the Plaintiff's criminal lawyer filed a motion to move the Plaintiff to safekeeping for medical attention ("First Safekeeping Motion") in Union County Superior Court where the Plaintiff's homicide case was pending. [Doc. 1: Complaint Ex at 12]. That court issued an Order to move the Plaintiff to safekeeping for medical treatment on August 4, 2016 ("First Safekeeping Order"). [Doc. 37-1: Plaintiff's MSJ 2 Ex at 53]. The Jail received the Safekeeping Order on August 5, 2016 and, three days later, the Plaintiff was transferred to Central Prison where he received treatment, including physical therapy and additional testing. [Doc. 50: Inmate Medical File at 104; Doc. 37: Plaintiff's MSJ 2 at ¶ 20].

The Plaintiff was transferred back to the Jail on December 2, 2016 for a court date.[18] [Doc. 37: Plaintiff's MSJ 2 at ¶ 7]. The Jail has nothing to do with the setting of inmates' court dates. [Doc. 44-1: Dennis Aff. at ¶ 14]. The Sheriff is required by law to have an inmate available to be produced in court on his court date upon the request of the District Attorney or the inmate's attorney. [Id.]. At that time, DAC "refused to allow inmates to be

---

[18] No court appearance actually occurred. [Doc. 1: Complaint at 1].

returned to their custody when they were brought back from safekeeping for a court date." [Id. at ¶ 12].  Instead, DAC "required a new safekeeping order every single time an inmate was returned to the county jail."[19]  [Id. at ¶ 13]. The Plaintiff remained at the Jail for the next several months without the treatment that he was receiving and that had been planned at Central Prison. [Doc. 1: Complaint at 10].

The Plaintiff's criminal lawyer filed a second safekeeping motion on April 24, 2017 ("Second Safekeeping Motion"), which the North Carolina criminal court granted on May 8, 2017 ("Second Safekeeping Order").  [Doc. 1: Complaint Ex at 16; Doc. 37-1: Plaintiff's MSJ 2 Ex at 21].  On June 2, 2017, the Plaintiff submitted a Release Date Inquiry to the Jail, asking why he had not been returned to safekeeping.  [Doc. 1: Complaint at 19].  The Jail responded that it had not received any paperwork about the Plaintiff returning to Central Prison.  [Id.].

The Jail received the Second Safekeeping Order on June 13, 2017, and the Plaintiff was transported back to Central Prison that same day.  [Doc. 44-1: Dennis Aff. at ¶¶ 21-22; Doc. 50: Medical Records at 97].   After returning to Central Prison, the Plaintiff received additional physical therapy

---

[19] This provision of North Carolina's safekeeping law was subsequently changed.  [Doc. 44-1: Dennis Aff. at ¶ 14].

and testing, which showed bulging discs and pinched nerves for which he now receives daily medication and steroid injections every four to five months. [Doc. 51: Plaintiff's MSJ Response at 5].

## IV. DISCUSSION

### A. Excessive Force

The Plaintiff alleges that Defendants Cardella and Green used excessive force against him on April 20, 2016, when Cardella handcuffed him forcefully in E Block and when both Cardella and Green slammed him to the ground and placed their knees in his back in the holding cell.

Pretrial detainees are protected from the use of excessive force by the Fourteenth Amendment. See Graham v. Conner, 490 U.S. 386, 395 n.10 (1989) ("protects a pretrial detainee from the use of excessive force that amounts to punishment"). To state an excessive force claim, a pretrial detainee must show only that the force "purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 576 U.S. 389, 396-97 (2015). The standard for assessing a pretrial detainee's excessive force claim is "solely an objective one." Id. at 397. In determining whether the force was objectively unreasonable, a court considers the evidence "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. (citing

<u>Graham</u>, 490 U.S. at 396). Considerations that bear on the reasonableness or unreasonableness of the force include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." <u>Id.</u>

The Plaintiff alleges that Defendant Cardella handcuffed him forcefully so that the cuffs were pinching his skin; that she failed to loosen the cuffs when he complained of pain; and that the cuffs drew blood and ripped his skin.

The Plaintiff's forecast of evidence is insufficient to show a genuine issue of material fact as to the reasonableness of Cardella's actions in cuffing the Plaintiff. The uncontroverted forecast of evidence, including video footage of the events in E Block, demonstrates that the Plaintiff approached Cardella aggressively. Cardella testified that she was afraid of the Plaintiff because he is larger than she and was jailed on a homicide charge. The Plaintiff admits that he argued with Cardella about going into the bathroom instead of going outside for exercise. Cardella attempted to temper the amount of force used by unholstering her OC spray and verbally warning the Plaintiff, then putting the spray away when the Plaintiff complied with her

order to back up.  The video footage further reveals that the Plaintiff moved while Cardella was attempting to handcuff him in such a way that a reasonable officer would have believed that the Plaintiff was offering some physical resistance.  Further, the Plaintiff suffered *de minimis* injury from the handcuffing.  The Plaintiff's contentions that the handcuffs were so tight that they drew blood and ripped his skin are conclusively refuted by photographs taken a short time after the incident, which reveal only an abrasion and mild redness and no blood whatsoever.  See Eastern Shore Mkt. Inc., 213 F.3d at 180 (courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.").  Therefore, this contention is insufficient to raise a genuine issue of fact.  Further, the handcuffs remained on him for only about 10 minutes.  [See Doc. 51: Plaintiff's MSJ Response at 1; Doc. 1: Complaint at 8, 9; Doc. 39-5: Medlin Affid. at ¶ 4].  The Plaintiff's aggressive actions, size, and opposition to orders; the threat that Cardella reasonably perceived; and the Plaintiff's lack of injury (besides a minor scrape on his wrist) demonstrate that Defendant Cardella's actions were objectively reasonable.

The Plaintiff asserts that Defendants Green and Cardella used excessive force inside the holding cell by slamming him to the holding cell floor and placing their knees on his back while removing his handcuffs.  It is

undisputed that: the Plaintiff had one hand uncuffed in the holding cell; the Plaintiff did not lie down as the officers instructed; an open handcuff that is attached to one wrist can be used as a weapon; and the officers forced the Plaintiff to the ground and placed knees on his back. Although the Plaintiff alleges that he experienced bruising and redness on his back, the medical records indicate that no redness, bruising, or swelling was present the next day. [Doc. 50: Inmate Medical Files at 108]. Further, an x-ray taken on June 6, 2016, showed no acute changes and no movement of the hardware in the Plaintiff's back from a prior surgery, and he was observed running, bending, and jumping in the weeks and months following the incident. [Doc. 50: Inmate Medical Files at 100, 107]. The Court concludes as a matter of law that it was not objectively unreasonable for Defendants Cardella and Green to force the Plaintiff to the floor and place knees on his back based on the uncontroverted evidence of the Plaintiff's failure to lie down on the floor when ordered to do so, his possession of an open handcuff that could be used as a weapon, his verbal and physical failure to obey officer orders a short time earlier, the serious and violent nature of the charge on which he was being held, and the lack of any observed injury.

Therefore, the Defendants will be granted summary judgment on this claim and the Plaintiff's Motion for Summary Judgment will be denied.

## B.    Deliberate Indifference to a Serious Medical Need

The Plaintiff alleges that he has received insufficient medical treatment for back pain following the April 20, 2016 incident.

To state a claim for deliberate indifference to a serious medical need, a plaintiff must show that he had serious medical needs and that the defendant acted with deliberate indifference to those needs.[20]    Heyer v.

---

[20] Because Plaintiff was a pretrial detainee at the relevant times, his deliberate indifference claim is properly brought under the Fourteenth Amendment rather than the Eighth Amendment.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983); see also Martin v. Gentile, 849 F.2d 863 (4th Cir. 1988) (applying the Fourteenth Amendment to an arrestee's deliberate indifference claim).  However, the Fourth Circuit has long applied the Eighth Amendment deliberate indifference standard to pretrial detainees' deliberate indifference claims.  See, e.g., Young v. City of Mount Ranier, 238 F.3d 567, 575 (4th Cir. 2001); Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999); Belcher v. Oliver, 898 F.2d 32, 34 (4th Cir. 1990); Martin, 849 F.3d at 863.  In Kingsley v. Hendrickson, 576 U.S. 389 (2015), the Supreme Court held that the test for excessive force claims brought by pretrial detainees under the Fourteenth Amendment differs from the test for excessive force claims brought by convicted prisoners under the Eighth Amendment.  Some circuits have held, in light of Kingsley, that an objective reasonableness standard should apply in custodial contexts besides excessive force, including medical claims.  See, e.g., Hardeman v. Curran, 933 F.3d 816 (7th Cir. 2019) (extending the objective standard to conditions of confinement cases); Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017) (extending objective standard to conditions of confinement cases); Castro v. City of Los Angeles, 833 F.3d 1060, 1069-70 (9th Cir. 2016 (en banc) (extending the objective standard to failure to protect claims).  The Fourth Circuit has not yet addressed this question.  See, e.g., Duff v. Potter, 665 F. App'x 242, 244-45 (4th Cir. 2016) (applying the Kingsley standard to a detainee's excessive force claim but declining to disturb the district court's ruling on plaintiff's claim of deliberate indifference to a serious medical need for procedural reasons).  However, the case law applying the deliberate indifference standard to such claims has not been overruled and the Fourth Circuit has not expressed any intention to do so.  See, e.g., Doe 4 by and through Lopez v. Shenandoah Valley Juvenile Ctr. Comm'n, 985 F.3d 327, 340 (4th Cir. 2021) (noting, in a different context, that the deliberate indifference standard applies to pretrial detainees' claims on inadequate medical care); Shover v. Chestnut, 798 F. App'x 760, 761–62 (4th Cir. 2020) (applying the deliberate indifference standard to a pretrial detainee's claim regarding a serious medical

United States Bureau of Prisons, 849 F.3d 202, 210 (4th Cir. 2017) (citing Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)).  A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Iko, 535 F.3d at 241 (internal quotation marks omitted).  To constitute deliberate indifference to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness."  Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* Farmer v. Brennan, 511 U.S. 825, 825 (1994).

The Plaintiff asserts his medical deliberate indifference claim against Sheriff Cathey only.  There is no allegation that Defendant Cathey was personally involved in the Plaintiff's medical care at the Jail.  As such, the Defendants are entitled to summary judgment to the extent that the Plaintiff asserts any deliberate indifference claim against Defendant Cathey in his individual capacity.  See Kentucky v. Graham, 473 U.S. 159, 166 (1985) (for personal liability, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.").  Further, the Plaintiff

---

need without discussing Kingsley); Krell v. Braightmeyer, 2020 WL 5640407 (4th Cir. Sept. 22, 2020) (same).

fails to present any forecast of evidence showing that Defendant Cathey knew of and tacitly approved or disregarded his subordinates' conduct that posed a pervasive or unreasonable risk of constitutional injury. As such, the Plaintiff's claim cannot survive summary judgment to the extent that any claim is asserted against Defendant Cathey on the basis of supervisory liability.[21] See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

The Plaintiff's claim against Defendant Cathey in his official capacity is "treated as a suit against the entity," which must then be a "'moving force' behind the deprivation." King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016) (quoting Polk County v. Dodson, 454 U.S. 312, 326 (1981)). Thus, the governmental entity's "'policy or custom' must have played a part in the violation of federal law." Graham, 473 U.S. at 166 (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)).

The Defendants have presented a forecast of evidence, which the Plaintiff has not rebutted, that Defendant Cathey promulgated a Medical Plan under which the Union County Health Department ("UCHD") has the responsibility to provide medical care to inmates at the Jail. [Doc. 39-11:

---

[21] The Plaintiff has filed employee records to support his argument that Defendant Cardella "has a history of not following jail policies…." [Doc. 36: Plaintiff's 1 at ¶ 7]; [see Doc. 36: Plaintiff's MSJ 1 Ex at 8, 10, 12, 22, 23] (Employee Warning Notices). However, none of these warnings relate to medical care, and the Plaintiff has failed to forecast any evidence that Defendant Cathey tacitly approved or knew of and deliberately disregarded any conduct that posed a pervasive or unreasonable risk of constitutional injury.

Medical Plan at 7]. The Medical Plan requires the provision of adequate medical care to inmates by qualified health professionals. [See id.]. Defendant Cathey is not an employee of UCHD and has no authority to make inmate medical decisions. [See id.]. Further, UCHD healthcare personnel are not employees of the Union County Sheriff's Office. See Young v. Bailey, 368 N.C. 665, 669, 781 S.E.2d 277, 280 (2016) ("a sheriff's office is not a program or department of a county … [and an] employee of a sheriff's office is not a county employee."). The Plaintiff has failed to forecast any evidence that Defendant Cathey's Medical Plan is constitutionally insufficient or resulted in the violation the Plaintiff's constitutional rights, or that Defendant Cathey had any role in the UCHD employees' provision of medical services at the Jail.

Moreover, the Plaintiff has failed to forecast evidence from which a reasonable fact finder could determine that any deliberate indifference to a medical need occurred. The evidence before the Court demonstrates that the Plaintiff received timely and adequate medical care. It is undisputed that the Plaintiff was offered medical treatment immediately after the April 20 incidents with Defendants Cardella and Green and that he received medical attention when he requested it the following day. At that time the Plaintiff was provided a seven-day course of ibuprofen for his complaints of pain even

though no bruising, redness, or swelling was observed. [Doc. 50: Inmate Medical File at 108]. After the Plaintiff completed the ibuprofen and continued to complain of pain, he was immediately provided naproxen for 14 days, which was repeatedly continued. When the Plaintiff continued to complain of back pain, he was provided the opportunity for an x-ray on May 20, 2016. Due to the Plaintiff's lack of cooperation, however, the x-ray was not taken. The x-ray was promptly rescheduled after the Plaintiff agreed to cooperate with the x-ray technician and the June 6, 2016 x-ray revealed no acute changes. The Plaintiff continued to receive medication for his reported pain, medical personnel followed up with him about his condition, he was provided a copy of exercises for his back, and he was offered instruction on those exercises. The Plaintiff was transferred to Central Prison for treatment after his criminal attorney obtained a Safekeeping Order, and the Plaintiff received additional care, including physical therapy and testing that was not available at the Jail.

The Plaintiff was transported back to the Jail for a court date in December 2016. Although he complains that he received no medical treatment at the Jail at that time, the Plaintiff has failed to present any forecast of evidence that he sought such care and was denied. When the

Jail received the Second Safekeeping Order, the Plaintiff was transferred back to Central Prison that same day.

The Plaintiff has failed to present a forecast of evidence that any Defendant knew of and deliberately disregarded a serious medical need. The Plaintiff's disagreement with the care that the Jail provided does not demonstrate that deliberate indifference occurred. Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances.") (quoting Wright v. Collins, 766 F.2d 841, 840 (4th Cir. 1985)). Further, any negligence or malpractice by the Jail's medical personnel with regards to diagnosing and treating the Plaintiff's back condition does not rise to the level of a constitutional violation. Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it.").

Therefore, the Defendants will be granted summary judgment on the Plaintiff's claim of deliberate indifference to a serious medical need and the Plaintiff's Motion for Summary Judgment will be denied.

### C.    Retaliation

The Plaintiff alleges that Defendant Cathey retaliated against him by interfering with his medical care.

The First Amendment right to free speech "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for exercising that right." Suarez Corp. v. McGraw, 202 F.3d 676 (4th Cir. 2000). Prison officials may not retaliate against an inmate for exercising a constitutional right. See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir.1978). In order to state a colorable retaliation claim under § 1983, a plaintiff must allege: "(1) [ ]he engaged in protected First Amendment activity, (2) the defendant[ ] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (quoting Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005)) (alteration in original). A plaintiff suffers adverse action if the allegedly retaliatory conduct "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Id. A plaintiff "must show that the defendant's conduct resulted in something more than a '*de minimis* inconvenience' to her exercise of First Amendment rights." Constantine, 411 F.3d at 500 (quoting ACLU of Md., Inc. v. Wicomico Cnty., Md., 999 F.2d 780, 786 n.6 (4th Cir. 1993)). This objective inquiry examines the specific facts of each case, taking into account the actors involved and their relationship. Balt. Sun Co. v. Erlich,

437 F.3d 410, 416 (4th Cir. 2006). The Plaintiff's actual response to retaliatory conduct "provides some evidence of the tendency of that conduct to chill First Amendment activity." Constantine, 411 F.3d at 500.

The Plaintiff appears to allege that Defendant Cathey deliberately interfered with his medical care by failing to return him to Central Prison following his December 2016 court date in retaliation for exercising his right to a trial. [See Doc. 1: Complaint at 2, 10; Doc. 37: Plaintiff's MSJ 2 at ¶¶ 11, 20, 21 23. The Plaintiff has failed to present any forecast of evidence that Defendant Cathey knew that the Plaintiff had been returned from safekeeping for a court date or that the Plaintiff was insisting on a trial in his criminal case.[22] Further, the Defendants have come forward with an unrebutted forecast of evidence that the Plaintiff was brought back from safekeeping in December 2016 for a regularly scheduled court date. The Sheriff was legally required to have the Plaintiff available for such a court date if requested by the district attorney or his lawyer. [Doc. 44-1: Dennis Aff. at ¶¶ 14-15]. The Defendants have also presented an unrebutted forecast of evidence that the failure to return the Plaintiff to Central Prison following his court date was due to Department of Adult Correction (DAC)

---

[22] Although not in the record of evidence, the Defendants' counsel asserts in his memorandum to this Court that the Plaintiff ultimately entered a guilty plea. [See Doc. 39: Defendants' MSJ Memorandum at 10 n. 2].

policy that "required a new safekeeping order every single time an inmate was returned to the county jail." The Plaintiff was promptly returned to Central Prison within hours of the Sheriff receiving the Second Safekeeping Order. [Doc. 44-1: Dennis Aff. at ¶ 13].

The Plaintiff has thus failed to forecast any evidence that his protected conduct was a substantial motivating factor for his transfer to the Jail for a court date, or for the Jail's failure to promptly return him to Central Prison, or that Defendant McCarthy was responsible for or even aware of the foregoing. See Constantine, 411 F.3d at 501 ("In order to establish th[e required] causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity."); Cottom v. Town of Seven Devils, 30 F. App'x 230, 234 (4th Cir. 2002) (granting summary judgment on plaintiffs' retaliation claim where plaintiffs failed to demonstrate that any action was taken against them in response to their complaints, and offered only speculation and hearsay in support of their claim); Haendel v. Va. Dep't of Corr., 2020 WL 7018564, at *9 n. 12 (W.D. Va. Nov. 30, 2020) (dismissing inmate's retaliation claim where the plaintiff failed to make the requisite preliminary showing that his protected conduct was a substantial motivating factor in the decision to charge him with disciplinary violations).

The Defendants will therefore be granted summary judgment on this claim and the Plaintiff's Motion for Summary Judgment will be denied.

### D. Qualified Immunity

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (*en banc*). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

Here, because the Plaintiff has not presented a forecast of evidence that the Defendants violated the Plaintiff's constitutional rights with his respect to his claims of excessive force, medical care, or retaliation, the Defendants are entitled to qualified immunity on these claims. As such,

Defendants' Motion for Summary Judgment based on qualified immunity will be granted.

## IV.   CONCLUSION

For the reasons stated herein, the Court will deny the Plaintiff's Motions for Summary Judgment [Docs. 36, 37] and will grant the Defendants' Motion for Summary Judgment [Doc. 38].

## ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motions for Summary Judgment [Doc. 36, 37] are **DENIED**; the Defendants' Motion for Summary Judgment [Doc. 38] is **GRANTED**; and this action is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the following exhibits are **SEALED** pursuant to the Protective Order entered in this case: Exhibits 2 through 5, 9 through 11, and 14 through 15 to Docket Entry 37; Exhibits 20 through 28 and 33 through 43 to Docket Entry 36; and Exhibits 3, 5 through 11, 21 through 22, and 24 through 26 to Docket Entry 51 and shall remain sealed until further Order of this Court.

The Clerk is respectfully directed to terminate this action.

**IT IS SO ORDERED.**

Martin Reidinger
Chief United States District Judge